STATE of Rhode Island

v.

Charles HOCKENHULL.

No. 85–531–C.A.

Supreme Court of Rhode Island.

May 27, 1987.

William Reilly, Public Defender, Janice M. Weisfeld, Barbara Hurst, Asst. Public Defenders, Providence, for plaintiff.

James E. O'Neil, Atty. Gen., Jane M. McSoley, Thomas Dickinson, Asst. Attys. Gen., Providence, for defendant.

## OPINION

WEISBERGER, Justice.

This case comes before us on appeal by the defendant, Charles Hockenhull, from a conviction of second-degree murder entered in the Superior Court after a jury trial. We reverse. The facts relevant to this appeal are as follows.

On November 8, 1984, at approximately 10:20 p.m., Joseph Rabuano was watching television with his girlfriend at his home on 31 West Street, apartment 4, West Warwick, when he heard a loud noise from apartment 5 next door. Rabuano's girlfriend turned the television down, and they heard a male and a female voice. The female voice cried out, "Charlie, what did you do to me? I'm bleeding."

Alarmed, Rabuano telephoned the police and, while waiting for them to respond, heard the female voice again, "I love you, Charlie. Hold me. I can't feel my feet anymore. There's blood going into my throat." Rabuano testified that the woman repeated over and over, "Hold me. Hold me. Charlie, I love you. Hold me."

Officer Nicholas Pellegrino and Officer Kevin O'Connell responded to the call, conversed briefly with Rabuano outside the apartment, and began ringing the doorbell at the back door of apartment 5. After receiving no response to the doorbell, Officer Pellegrino banged on the door and announced himself as a police officer. They then heard the front door of the apartment slam and saw defendant leave the apartment and head toward his car in the parking lot. The officers called out loudly ordering defendant to stop and identifying

themselves as police officers. The defendant ran out of the parking lot and Officer O'Connell ran after him.

Officer Pellegrino proceeded to the front of the apartment and, upon noticing a blood spot on the partially open front door of apartment 5, began to push on the door to open it. Because the door was obstructed by a woman's body, Officer Pellegrino had to force the door open. Inside, he and Officer O'Connell, who had returned, discovered Lori Fallon lying on the floor breathing shallowly, her clothes stained with blood and her throat slashed. The room was smeared with blood.

After summoning the rescue squad, Officer O'Connell checked the other rooms of the apartment to make sure no one else was inside and then returned to attend to the victim. Sergeant Boulton arrived at the apartment after the rescue squad and ordered Officers O'Connell and Pellegrino to search for the suspect and take witness statements. Detective Peter Appollonio, the Bureau of Criminal Identification (BCI) officer for the department, arrived on the scene and secured the apartment. Detective James Smith thereafter arrived at the scene, returned to the West Warwick police station for proper processive BCI equipment, then went back to the scene with the equipment. He and Detective Appollonio then thoroughly searched, photographed, and diagrammed defendant's apartment. They seized a pillow, couch cushions, playing cards, a phone book, beer bottles, a peppermint schnapps bottle, a man's jacket, a scatter rug, a living room carpet, a sofa, and a pair of woman's sneakers. The seized items were transported to the crime laboratory where tests for the presence of blood were performed on the items. The police at no time attempted to obtain a search warrant.

The defendant was found by the police at approximately 5:10 a.m. When found, defendant was lying in a fetal position, off to the side of the road. He appeared to be semiconscious—his eyes were closed and he was shaking. His clothes were saturated with blood.

Lori Fallon died as a result of approximately twenty-six stab wounds. The defendant later told the police that he had no memory of stabbing Ms. Fallon, that he loved her, and that he could not believe she was dead.

The defendant raises three issues in support of his appeal. We shall address two of these issues in the order in which they were presented in defendant's brief and will provide such further facts as may be necessary to our consideration of these issues.

I

INSTRUCTIONS TO THE JURY

The defendant asserts that the trial justice incorrectly instructed the jury on the effect of a finding of diminished capacity and further that the trial justice erred in refusing to instruct the jury on the lesser included offense of voluntary manslaughter. We agree.

At trial, testimony was presented to the effect that in the hours immediately preceding the homicide defendant consumed a significant quantity of drugs and alcohol. Relying on this evidence, defense counsel requested the trial justice to instruct the jury that diminished mental capacity sufficient to negate the element of specific intent to kill reduces the crime of murder to the crime of voluntary manslaughter. Although the trial justice did instruct the jury that a defendant's intoxication due to alcohol or drug consumption is recognized by the law as a defense to an offense that requires a specific intent, he did not explain to the jury that the absence of a specific intent to kill owing to a defendant's diminished capacity would reduce the crime of murder to the lesser included crime of voluntary manslaughter. Instead, the trial justice told the jury to return a verdict of *not guilty* if they found that defendant's diminished capacity negated his ability to form a specific intent to kill.[1] Moreover,

1. The trial justice's instruction to the jury on the issue of diminished capacity was as follows:

"The law recognizes intoxication as a defense to an offense which requires a specific

the trial justice neglected to instruct the jury on the elements of manslaughter by reason of diminished capacity but instructed them only in regard to the offense of involuntary manslaughter.[2] Defense counsel made timely objection to the trial justice's instructions.

■ Under the diminished capacity doctrine, an essential element of the crime of murder is absent when a defendant is so intoxicated as to render him incapable of forming the specific intent to kill. *State v. Correra*, 430 A.2d 1251 (R.I.1981).[3] A defendant's diminished mental capacity reduces the crime of murder to the lesser included crime of voluntary manslaughter. *Id.; see State v. Turley*, 113 R.I. 104, 318 A.2d 455 (1974).

■ Manslaughter is the unlawful killing of a human being without malice aforethought, either express or implied. *State v. Lillibridge*, 454 A.2d 237 (R.I.1982); *State v. Goff*, 107 R.I. 331, 267 A.2d 686 (1970). Because manslaughter is a "catch-all" concept encompassing "all homicides which are neither murder nor innocent," Perkins & Boyce, *Criminal Law* 102 (3d ed. 1982), it may be applied in varying contexts.

■ Involuntary manslaughter is generally defined as an unintentional homicide without malice aforethought, committed either in performance of an unlawful act not amounting to a felony or in the performance of a lawful act with criminal negligence. *State v. Freeman*, 473 A.2d 1149 (R.I.1984); *State v. Lillibridge*, 454 A.2d 237 (R.I.1982); *State v. Vargas*, 420 A.2d 809 (R.I.1980). Involuntary manslaughter resulting from criminal negligence is a lesser degree of homicide than an act that may constitute murder as the result of the wanton recklessness of the accused. *See State v. Iovino*, 524 A.2d 556 (R.I.1987).

■ Voluntary manslaughter, on the other hand, is the product of a deliberate act that does not include the element of malice aforethought by reason of one or more mitigating factors.[4] Such mitigating

intent, but only when the intoxication, or drug influence, is of such a degree to completely paralyze that defendant's will and take from him the power to withstand evil impulses and render his mind incapable of forming any sane design.

"The State has the burden of proof on this issue, as it does on all issues in a criminal case.

"Now, if you're satisfied beyond a reasonable doubt that the defendant was not intoxicated, or not under the influence of drugs to such a degree as to completely paralyze his will, and take from him the power to withstand evil impulses and render his mind incapable of forming any sane design, and are otherwise satisfied that this defendant had the specific intent to kill, then you will consider the element of the offense intent to kill has been proved.

"Conversely, ladies and gentlemen, if you are not satisfied beyond a reasonable doubt that the defendant was not so intoxicated by alcohol or under the influence of drugs so as to completely paralyze his will and take from him the power to withstand evil impulses and render his mind incapable of forming any sane design, you will find the element of specific intent to kill had not been proven. *Accordingly, you will find the defendant not guilty since intent to kill is a special element.*

"Again, the burden is upon the State. If you find the State has proved the intent to kill, that he was not so intoxicated, or not so under the influence of drugs, as to withstand evil impulses, or render his mind incapable of forming any sane design, and you are otherwise satisfied that he had the specific intent to kill, you would consider that element to have been proven." (Emphasis added.)

2. The trial justice instructed the jury as follows:

"Manslaughter is defined as an unintentional homicide, without malice aforethought or the specific intent to kill, committed either in the performance of an unlawful act not amounting to a felony, or in the performance of a lawful act with criminal negligence. That is, without due caution and circumspection, and that is manslaughter."

3. In order to convict a defendant of first or second degree murder, the state must prove that the defendant acted with malice aforethought. G.L.1956 (1981 Reenactment) § 11–23–1. It is well settled that specific intent to kill is an essential element of second degree murder. *State v. Amado*, 433 A.2d 233 (R.I.1981); *State v. Clark*, 423 A.2d 1151 (R.I.1980); *State v. McGranahan*, 415 A.2d 1298 (R.I.1980).

4. Although voluntary manslaughter has been defined as an intentional killing, *State v. Lillibridge*, 454 A.2d 237 (R.I.1982); *State v. Vargas*, 420 A.2d 809 (R.I.1980), such intent is either mitigated by heat of passion resulting from adequate provocation or is reduced to a general intent rather than a specific intent crime as a result of diminished capacity.

factors may exist when the crime is committed in the heat of passion arising as a result of adequate provocation. *State v. Lillibridge*, 454 A.2d 237 (R.I.1982); *State v. Vargas*, 420 A.2d 809 (R.I.1980); *State v. Goff*, 107 R.I. 331, 267 A.2d 686 (1970). Voluntary manslaughter may also result from a deliberate act of homicide wherein the accused is suffering from sufficiently diminished capacity that renders him unable to form the specific intent necessary to constitute murder. Such diminished capacity may result from intoxication "of such a degree as to completely paralyze the will of the respondent, take from him the power to withstand evil impulses and render his mind incapable of forming any sane design." *State v. Vanasse*, 42 R.I. 278, 281, 107 A. 85, 86 (1919); *see State v. Doyon*, 416 A.2d 130 (R.I. 1980); *State v. McGehearty*, 121 R.I. 55, 394 A.2d 1348 (1978); *Danahey v. State*, 118 R.I. 268, 373 A.2d 489 (1977); *State v. Turley*, 113 R.I. 104, 318 A.2d 455 (1974).

In the case at bar the applicable form of manslaughter raised by the factual issues is that of voluntary manslaughter reduced from the crime of murder by virtue of the doctrine of diminished capacity, under which severe intoxication resulting from the ingestion of alcohol and drugs precludes the formation of a specific intent to kill.

■ In this case the trial justice determined that an instruction on diminished capacity was warranted by the evidence, but he failed to instruct the jury properly on the lesser included offense of voluntary manslaughter by reason of diminished capacity. General Laws 1956 (1985 Reenactment) § 8–2–38 requires a trial justice to instruct the jury in the law that must be applied to the issues raised by the parties in order to secure a fair trial. A trial justice's refusal to give an instruction to which the defendant is entitled may constitute prejudicial error. *State v. Robalewski*, 418 A.2d 817 (R.I.1980); *State v. Milazzo*, 116 R.I. 443, 358 A.2d 35 (1976); *State v. Butler*, 107 R.I. 489, 268 A.2d 433 (1970); *Macaruso v. Massart*, 96 R.I. 168, 190 A.2d 14 (1963).

We have repeatedly stated that a criminal defendant is entitled to an instruction on a lesser included offense if such an instruction is warranted by the evidence. *State v. Lemon*, 497 A.2d 713 (R.I.1985); *State v. Kaner*, 463 A.2d 1348 (R.I.1983); *State v. Austin*, 462 A.2d 359 (R.I.1983). As a matter of practice, we require that a lesser included offense instruction be given when warranted on account of the danger that, absent such an instruction, a jury may erroneously convict a criminal defendant of the principal offense charged, despite the prosecution's inability to prove an element of that offense, when the jury is convinced that the defendant's conduct was criminal. As Justice Brennan aptly stated in *Keeble v. United States*, 412 U.S. 205, 212–13, 93 S.Ct. 1993, 1997–98, 36 L.Ed.2d 844, 850 (1973):

"[I]t is no answer to petitioner's demand for a jury instruction on a lesser offense to argue that a defendant may be better off without such an instruction. True, if the prosecution has not established beyond a reasonable doubt every element of the offense charged, and if no lesser offense instruction is offered, the jury must, as a theoretical matter, return a verdict of acquittal. But a defendant is entitled to a lesser offense instruction—in this context or any other—precisely because he should not be exposed to the substantial risk that the jury's practice will diverge from theory. Where one of the elements of the offense charged remains in doubt, but the defendant is plainly guilty of *some* offense, the jury is likely to resolve its doubts in favor of conviction."

As suggested in *Keeble*, the instruction by the trial justice that the jury's choice was between a verdict of guilty of murder and a verdict of not guilty did not give them the intermediate alternative of a finding of guilty of the lesser included offense of manslaughter. Consequently, the jury having been convinced that the defendant was clearly guilty of a criminal act may well have been reluctant to free him completely from responsibility, although they might have been prepared, if given the

opportunity, to consider the offense of manslaughter as an alternative to a finding of guilty of the greater offense. Thus as a matter of Rhode Island common law and statutory requirement, the failure to instruct that the jury might find the defendant guilty of voluntary manslaughter was erroneous and prejudicial.

The defendant asserts that the trial justice's failure to instruct the jury correctly on voluntary manslaughter by reason of diminished capacity violated his right to fair trial guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution and art. I, sec. 10, of the Rhode Island Constitution. The United States Supreme Court has held that, in cases involving imposition of the death penalty, failure to instruct the jury on a lesser included offense violates both the Eighth and the Fourteenth Amendments. *Beck v. Alabama,* 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980); *see Spaziano v. Florida,* 468 U.S. 447, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984). The Court, however, specifically left open the question of whether the due process clause requires instructions on lesser included offenses when the death penalty is not implicated. *Beck,* 447 U.S. at 638 n.14, 100 S.Ct. at 2390 n.14, 65 L.Ed.2d at 403 n.14. Since it is our conclusion that the trial justice committed reversible error in failing to instruct the jury in accordance with Rhode Island practice, we decline to address the issue of whether an instruction on a lesser included offense is mandated by the Federal Constitution and base our decision on the common law of Rhode Island. *See State v. Lemon,* 497 A.2d 713 (R.I.1985); *State v. Kaner,* 463 A.2d 1348 (R.I.1983); *State v. Goff,* 107 R.I. 331, 267 A.2d 686 (1970).[5]

II

THE WARRANTLESS SEARCH OF DEFENDANT'S APARTMENT

At trial defense counsel moved to suppress evidence obtained as a result of the warrantless search of defendant's apartment, asserting that the items were seized in violation of the Fourth Amendment to the United States Constitution and art. I, sec. 6, of the Rhode Island Constitution. The trial justice denied defendant's motion on the ground that the items taken were in plain view of officers entering the apartment in response to an emergency. The defendant contends that the trial justice erred in refusing to grant his motion to suppress. We agree.

In *Mincey v. Arizona,* 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978), the United States Supreme Court held that the seriousness of an offense under investigation creates no exigency that would justify a warrantless search of a dwelling absent any indication that the evidence would be lost, destroyed, or removed before a warrant could be obtained. In *Mincey* a police officer was shot during a raid on the defendant's apartment. Drug enforcement agents on the scene conducted a brief search of the apartment for additional victims or suspects and remained on the premises to guard the suspects and to secure the scene. About ten minutes later, homicide detectives arrived at the scene and conducted an exhaustive, warrantless search of the apartment over a period of approximately four days. The Court stated that although the original entry and sweep search by law enforcement officials was justified by exigent circumstances, the scope of the subsequent search exceeded the exigency and was therefore violative of the Fourth Amendment.

The Supreme Court reaffirmed *Mincey* in *Thompson v. Louisiana,* 469 U.S. 17, 105 S.Ct. 409, 83 L.Ed.2d 246 (1984). The Court, in deciding *Thompson,* repeated its position that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment subject only to a few specifically established and well delineated exceptions." *Id.* at 19–20, 105 S.Ct. at 410, 83 L.Ed.2d at 250 (quoting *Katz v. United States,* 389 U.S.

---

5. The practice of permitting a jury to find a criminal defendant guilty of any lesser offense included in the crime charged originated at common law. 2 Hale, Pleas of the Crown, 301–02 (1736).

347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576, 585 (1967)). The Court emphasized that a warrantless search of premises that police officers have lawfully entered is limited to a brief sweep to ascertain whether additional victims or suspects are still on the premises.

Similarly, this court held in *State v. Jennings*, 461 A.2d 361 (R.I.1983), that a warrantless search beyond the scope of a brief survey to ascertain whether additional malefactors or victims are inside the premises is violative of the Fourth Amendment to the United States Constitution. In *Jennings* the police responded to a rescue call and found a wounded man lying on the ground outside an apartment building. The defendant accompanied the victim to the hospital. A resident of the apartment building then informed one of the officers that the defendant's apartment had been ransacked. The officer entered the apartment and briefly searched it for intruders. He went downstairs and asked his superior officer to come up and look at the apartment, whereupon the two officers proceeded to conduct a full scale search. This court held that although the initial search of the apartment for suspects or additional victims was justified, the second entry onto the premises did not fall within any exception to the warrant requirement. The court emphasized that "[w]hen the security check has been completed, the area is secured, and there is no longer any danger of the loss or destruction of evidence, the search must cease. Any further intrusion is a violation of the Fourth Amendment." *Id.* at 367.

■ The instant case is governed by *Mincey, Thompson,* and *Jennings.* Once defendant's apartment had been secured, the exigency that justified the entry onto the premises terminated. Since there was no danger after that point that the items in the apartment would be lost, destroyed, or removed before a search warrant could be obtained, the police were required to obtain a warrant before searching the apartment

further. Since they failed to do so, the search violated the Fourth Amendment and the evidence seized during the course of that search must be suppressed.

The state argues that the seizure of items from the apartment was permissible under the plain view exception to the warrant requirement. We disagree. The plain view doctrine is not applicable unless the items seized are evidence of a crime that came into view of an officer lawfully present on the premises searched. *State v. Eiseman,* 461 A.2d 369 (R.I.1983). Although Officers O'Connell and Pellegrino could have seized evidence in plain view while lawfully on the premises in response to an emergency, the officers who arrived subsequently were not lawfully on the premises.

A search within the exigent circumstances exception to the warrant requirement must be " 'strictly circumscribed by the exigencies which justify its initiation.' " *Mincey v. Arizona,* 437 U.S. at 393, 98 S.Ct. at 2413, 57 L.Ed.2d at 300 (quoting *Terry v. Ohio,* 392 U.S. 1, 26, 88 S.Ct. 1868, 1882, 20 L.Ed.2d 889, 908 (1968))." *State v. Jennings,* 461 A.2d at 367. The exigent circumstances exception does not, therefore, extend to officers who arrive on the scene once the premises have been secured. Since the officers who seized the items from the defendant's apartment were not lawfully on the premises, the plain view exception to the warrant requirement is inapplicable. Accordingly, we conclude that the trial justice erred in refusing to grant the defendant's motion to suppress the evidence obtained as a result of the warrantless search.[6]

For the reasons stated, the defendant's appeal is sustained, the judgment of conviction is vacated, and the case is remanded to the Superior Court for further proceedings in accordance with this opinion.

---

**6.** The defendant asserts that the trial justice erred in refusing to allow the admission of certain testimony on the basis of the form of the

questions. Because resolution of the first two issues is dispositive of the case, we decline to address this question.